# COURT OF APPEALS OF VIRGINIA

**Record No. 0270-25-2**

ROSCOE WALTER JOHNSON
v.
COMMONWEALTH OF VIRGINIA

Present: Chief Judge Decker, Judges Raphael and White

Argued at Lexington, Virginia

Opinion Issued July 21, 2026[*]

## FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

Travis C. Gunn (McGuireWoods LLP, on briefs), for appellant.

Shelly R. James, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE KIMBERLEY SLAYTON WHITE

A jury convicted Roscoe Walter Johnson of abduction, unlawful wounding, leaving the scene of an accident, misdemeanor domestic assault and battery, reckless driving, and eluding. The trial court sentenced Johnson to 25 years and 30 months' incarceration, with 15 years and 23 months suspended. On appeal, Johnson argues that the trial court erred when it denied his *Batson*[2] challenge. He also challenges the sufficiency of the evidence supporting his convictions for unlawful wounding, abduction, and eluding. Finally, Johnson contends that the trial court

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

erred when it ruled that he had waived his right to counsel for the sentencing hearing and denied his request for a continuance. Finding no error, we affirm the trial court.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

Tonya Washington and Johnson had lived together for several months when, in the spring of 2019, Washington ended their relationship. Johnson, however, continued to call Washington every day. Washington finally agreed to have dinner with Johnson in June 2019. On June 8, 2019, they drove to Richmond in Johnson's SUV for dinner and a wine tasting.

Washington believed that everything was fine as they started the return trip home. During a brief stop, though, Johnson mentioned resuming their relationship and became emotional when she declined. Washington was concerned by Johnson's behavior and comments, so she texted her brother to meet them at her home.

When Johnson saw Washington's brother's SUV at her home, he did not stop, because he said they were not finished talking and could not talk at Washington's home because her brother was there. As he circled the block, Washington asked him to "just take [her] home." He said, "so you don't love me," and she said, "no." Responding "F that," Johnson sped away from Washington's home.

Washington repeatedly begged Johnson to stop; he ignored her. As she fumbled for her phone in her purse, Johnson bit her twice on her forehead. Bleeding and in pain, she yelled for

- 2 -

Johnson to let her out of the SUV. Instead, Johnson proceeded through an intersection without stopping and drove toward the rural area of Spotsylvania County.

When they passed a gas station, Washington leaned over and shifted the SUV into park. She opened the door to escape but Johnson grabbed her arm and continued driving, dragging Washington for 25 feet. He stopped in the middle of the road, "jumped out," went around the SUV, and "came up behind [her]" to force her back into the SUV, while biting her on the hip. Johnson dropped Washington in a grassy area, tried to take her phone, then returned to the car.

Several witnesses at the gas station heard Washington's screams and saw her being dragged. They saw Johnson get out of the car "rather quickly," go around to Washington, and saw his attempts to force her back into the SUV. Two witnesses described it as something like a football tackle. Several men approached the SUV to help Washington.

When Spotsylvania Sheriff's Deputy Michael Pearce arrived, he saw Johnson's SUV in the road and Washington lying in the grass. When Johnson saw Pearce approaching, he returned to his SUV and drove away. When the witnesses told Pearce that the SUV was involved in the incident, he followed it and "chirp[ed]" his siren. After driving about a half mile, Johnson stopped in a parking lot and "emerged" with a cell phone in his hand. He "exchang[ed] words" with Pearce, ignored Pearce's commands to "put his hands up," and was "excited." Eventually, Pearce handcuffed Johnson and returned with him to the gas station.

Meanwhile, an ambulance and other deputies arrived where Washington had been lying in the grass. Deputy Collins collected evidence. EMTs found Washington crying and "very scared." She had bite marks on her forehead and "road-rash-type" injuries to her feet[3] and knees.

---

[3] Washington was wearing flip-flops when Johnson was dragging her but could not remember what happened to them.

Washington was bleeding from her "head and . . . knees and [the] top of [her] feet and on [her] hip." She had a bruise on her arm and a bite mark on her hip.

I. Pretrial Proceedings

On August 19, 2019, a grand jury indicted Johnson for malicious wounding and abduction. On November 18, 2019, a grand jury indicted Johnson for assault and battery of a family member, third offense; reckless driving; eluding; and hit and run. Before trial, Johnson filed a series of *pro se* motions[4] and sent letters to the court although he was represented by retained counsel. His retained counsel moved to withdraw due to "a conflict between [Johnson] and counsel," which was granted. Johnson appeared at the next status hearing without counsel, but told the trial court that he intended to retain counsel and did not want court-appointed counsel. The trial court continued the case for a week. At a status hearing, Johnson admitted that he had not hired an attorney and asked for court-appointed counsel. The trial court appointed him counsel, but at the arraignment, Johnson seemed confused. After conferring with Johnson, counsel moved to withdraw based on Johnson's *pro se* motions filed about his previous, retained counsel. Johnson objected to the withdrawal, and the trial court denied the motion.

Johnson then filed additional *pro se* motions. At a January 2020 hearing, the trial court instructed Johnson to stop filing motions and to discuss the issues with his attorney. The trial court also denied Johnson's request for bond. In February 2020, counsel renewed his motion to withdraw because Johnson and his counsel's "relationship has significantly deteriorated"; Johnson claimed his counsel was working to "violate [Johnson's] rights"; Johnson said his counsel was "setting [him]self up to lose [his] license"; and Johnson said he was "going to have [his counsel] locked up." Over Johnson's objections, the trial court granted the motion and

_____

[4] Johnson's motions addressed allegations of ineffective assistance of counsel and requests to dismiss the charges and requests for discovery.

- 4 -

appointed another attorney to represent Johnson.  Johnson continued to file *pro se* motions despite the trial court's admonition.

In March 2020, the trial court told Johnson that his motions were denied and again told him not to file any motions.[5]  In April 2020, Johnson's newly appointed counsel moved for bond consideration; Johnson sent him an addendum to include in his argument.  The trial court denied the motion, and Johnson instructed his attorney to file an appeal with this Court.  By order entered on October 14, 2020, this Court affirmed the trial court's denial of both bond motions. *See Johnson v. Commonwealth*, No. 0703-20-2 (Va. Ct. App. Oct. 14, 2020) (order).  Counsel moved to withdraw in February 2021.  The trial court denied the motion.

The jury trial, originally scheduled for October 1, 2019, was continued to May 2021.[6] Johnson retained new counsel in April 2021 and moved for a continuance of the trial.  The trial court granted the motion and continued the jury trial to September 2021.  After additional continuances and a competency evaluation, the jury trial began in March 2022.[7]

II.  Jury Selection

At trial, 27 people appeared for jury duty; 4 members of the venire were minorities.  In a *Batson*[8] motion, Johnson challenged two of the Commonwealth's four preemptory strikes, both Latina women.  He said that the motion was "not reflective of the Commonwealth['s Attorney] because [he held] her in high esteem," but asserted that the jury pool was "so challenging . . . to

---

[5] Still, the clerk's office received motions and letters from Johnson in March, April, June, and August 2020 and letters addressed to counsel, the clerk's office, and the trial court.  Some of the letters complained about his counsel's representation.

[6] The jury trial was rescheduled multiple times.

[7] Johnson filed a separate *pro se* motion on March 14, 2022, asserting his constitutional rights for trial, which the clerk's office forwarded to his counsel.

[8] *Batson v. Kentucky*, 476 U.S. 79 (1986).

minorities" and needed "greater [minority] representation." The trial court noted that an African-American member of the venire had been selected to serve. The Commonwealth stated that it did not "pay attention . . . about their ethnicity in making choices," but rather "looked at people that gave answers and that were spoken to." It clarified that Juror 38 was struck because she "had a baby at home that she watches" so she was struck out of "kindness" in an "effort to accommodate her schedule." Juror 11 had not been "heard from" or "spoken to" and "hadn't really talked" during voir dire, and that was the reason for the strike.

Johnson argued that Juror 38 could find "other people" to "take care of th[e] child." He added that striking Juror 11 had "no basis whatsoever . . . [given] the social racial dynamics of this jury pool." The trial court ruled that the Commonwealth had stated "nondiscriminatory bases" for its preemptory strikes and denied Johnson's motion.

III. Trial Proceedings

At trial, Washington said that she was in an intimate relationship with Johnson from the fall of 2018 until the spring of 2019. Johnson was not "very happy" when she broke off the relationship; he called every day asking her to "give him another chance." She finally agreed to "go out to eat" with him "as a friend" in June because she "figured by that time he would understand that [they] weren't going to be together."

Washington recounted the events of the evening. She said Johnson was "calm" during dinner and "still fine" during the wine tasting. During the trip home, though, he repeatedly asked why they "couldn't be together," was "really emotional," and "started to cry." She told Johnson she did not love him. As he "turned the wheel real fast" and drove "the opposite way from [her] house," she implored him, "please, can you stop, please, can you stop"; he refused. Washington identified the photographs of her injuries taken at the hospital and said she still had scars from the injuries six months later.

Deputy Collins testified that he found a wig and a flip-flop in the front passenger area in Johnson's SUV. He found a "blood smear on the passenger's seat" and "scratches or claw marks on the dashboard on the passenger's side." Collins also identified the flip-flop in the road as the one seen from his body-worn and dashboard cameras.

Wade Reibsome, an eyewitness, saw Washington trying to get out of the SUV and Johnson dragging her as he drove, about 10 to 15 feet. Johnson reversed the SUV about four feet after Washington "had her feet out" of the car. He then parked, got out of the car, "football tackle[d] her back into the car," and "punch[ed] her in the side." Reibsome heard her screaming and saw her shoes fall off. Johnson stopped when Reibsome and "two other guys" approached the SUV. Reibsome called for help. The jury heard the 911 call recording. Reibsome said Washington was "frightened" and "crying" and described Johnson's demeanor as "wanting to be in control." Todd Hall, another eyewitness, heard a "female's voice cry out in a way that you don't like to hear." He recounted Washington's escape from the car and being dragged by Johnson.

Spencer Smith heard "tires screeching" and "screaming," and he approached Johnson's SUV with Reibsome and Hall. He saw Johnson "aggressively" forcing Washington back into the SUV by "like elbowing, throwing his forearm trying to force her into the vehicle." She repeatedly yelled for help. Once freed, Washington approached Smith and he took her to a grassy area after she "snatched" her purse out of the SUV before Johnson fled. She collapsed on the ground and was very emotional. Johnson returned and said that Washington "tried to jump out the vehicle while it was moving," then tried to take her phone. Johnson left when he saw an officer approach.

After the close of the Commonwealth's evidence, Johnson moved to strike, challenging the sufficiency of the evidence to support the malicious wounding and abduction charges.

Counsel described Johnson as "unraveling" in the car. The trial court found the evidence "sufficient to create a jury issue on both the malicious wounding, the maliciousness part, and the abduction," and denied the motion.

Johnson testified. He disputed Washington's statements that she had minimal communications with him after the break-up. According to Johnson, he responded when she asked him to jumpstart her brother's truck, did other things for her, and had frequent voice and video calls. Johnson said they had intercourse and showered together before leaving for dinner. He recounted that Washington took pain medications and drank a Corona beer on the way to dinner. At dinner, Johnson drank lemonade, while Washington "had two Coronas." After dinner, they shared "over fifteen" wine samples at a winery, although he later said that only Washington drank the wine.[9] Johnson said that Washington "pulled out" a "vape pipe" with "THC in it" and "hit it right there in front" of the winery.

On the way back to Washington's house, Johnson said that they were "singing to each other" and he started crying because the music on the radio was "old school music" and he got "real emotional." He denied that Washington talked about breaking up during the drive, but claimed that she told him she was returning to her husband. Johnson agreed that he did not stop at Washington's house because her brother was there and he was "trying to get [himself] back together." He drove to a gas station and noticed that Washington was "hanging out the joint," so he "grab[bed] her, [and] pull[ed] her back" in the SUV. Johnson claimed that he let Washington out of the car when she asked, then she "grabbed the door," and he saw the injuries "the pictures showed." He explained that he got out of the SUV and tried to get her back into the SUV because she "was injured," and he was "trying to get her to a hospital." Johnson denied biting Washington on her forehead, but claimed he "had a forensic doctor that was supposed to be" at

_____

[9] Johnson accused the Commonwealth of "trying to cross [him] up."

trial but had not appeared.[10]  The jury was instructed to disregard Johnson's testimony about having a forensic doctor under subpoena.

Johnson denied that the witnesses came to his car and said that he did not hear Washington saying she did not want to go back in the SUV.  He denied that the witnesses helped Washington.  Johnson claimed that he tried to retrieve his phone from Washington because "she accused [him] of being with other women while [they] were together."

Johnson claimed that Pearce did not have his blue emergency lights activated when he arrived at the scene and denied driving away when Pearce arrived; he made inconsistent statements about whether he left the scene, ultimately claiming that he "never said that [he] left the scene."  He denied dragging Washington.  According to Johnson, when he "went to pull off" into traffic, Washington "grabbed ahold of the [open] door," and she was "going along with the vehicle" until he stopped.  Johnson said he held her arm only to keep her from "exit[ing] the vehicle for no reason, no reason at all."  He disclaimed any responsibility for her injuries and asserted that he "saved her life."

Johnson acknowledged that he was a convicted felon but was unsure how many convictions were on his record.  He stipulated that he had misdemeanor convictions for stealing after he denied having convictions for "lying, cheating, or stealing."  At the close of all the evidence, Johnson renewed his motion to strike the malicious wounding and abduction charges and challenged the evidence of malice.  The trial court ruled that there was sufficient evidence to create a jury issue on malice and the abduction and denied the motion.

---

[10] Johnson's counsel stopped his testimony midway, saying that Johnson had made a representation that was "inconsistent with [counsel's] knowledge" under oath, putting him in "a quandary" where he had to "figure out . . . [his] ethical duty."  The court recessed while counsel consulted the "Virginia Bar hotline."

The jury convicted Johnson of abduction, unlawful wounding,[11] assault and battery of a family member, hit and run, reckless driving, and eluding. Both parties indicated that there were no other motions or matters for the trial court until sentencing.

IV. Sentencing

Before sentencing, Johnson's trial counsel moved to withdraw. The trial court denied the motion and continued sentencing to July 2022. Johnson then filed a series of *pro se* pleadings and motions asserting ineffective assistance of counsel, requesting a formal investigation of the jury trial, and telling the court that he had "fired" trial counsel. Trial counsel renewed his motion to withdraw as counsel, which the trial court granted. It continued the sentencing hearing to August 2022.

At sentencing, Johnson told the trial court that he had not retained new counsel[12] and requested a continuance. After hearing arguments, the trial court denied the request, finding that Johnson's "behavior with [his] attorneys really constitute[d]" and "amount[ed] to a waiver by [his] conduct with [his] attorney." The trial court reminded Johnson that it had explained at a previous hearing that "if [he] didn't have a lawyer [at sentencing]" it would "be going forward." In fact, the trial court did tell him "I'm going to give you -- August 15th, we're going to have a sentencing that day and you're telling me you want to hire a lawyer." When Johnson asked whether he would be sentenced if he did not have an attorney, the trial court responded, "We'll talk about it on August 15th," qualifying this statement saying, "Depends on what you ask for. You're telling me you're going to hire a lawyer." The court pointed out that Johnson had "put [his] counsel in a position that precluded effective representation" and that his conduct amounted

_____

[11] A lesser-included offense of malicious wounding.

[12] Johnson claimed that his family was hiring a lawyer. There was no family member present to confirm his statement.

- 10 -

to "a constructive discharge." The trial court determined that Johnson had "effectively waived his right to counsel based on his conduct" and reminded Johnson that he and the trial court had "talked about [his] conduct with [the] attorneys that [he] had throughout . . . [t]wo, three years already."

During the sentencing hearing, Washington testified that she suffered from nightmares because of the assault and the wounding. She could not "come out of [her] house" after the attack, still had "anxiety," did not feel safe, and was "scared" about Johnson's release from incarceration. Johnson, during his testimony, repeated his view that he had saved Washington's life when she tried to jump from the SUV and reiterated that he was not prepared for sentencing. After hearing sentencing arguments and reviewing Johnson's pre-sentence report and criminal history, the trial court sentenced Johnson to 25 years and 30 months' incarceration, with 15 years and 23 months suspended. Johnson appeals.

## ANALYSIS

### I. The trial court properly denied Johnson's *Batson* challenge.

The "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that [B]lack jurors as a group will be unable impartially to consider the State's case against a [B]lack defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). "*Batson* stands as a watchtower over voir dire in criminal cases to guard juries from being poisoned by racial bias whether injected by prosecutors or by criminal defense attorneys. *Batson* does so by targeting '*purposeful* discrimination in selection of the petit jury.'" *Bethea v. Commonwealth*, 297 Va. 730, 748 (2019) (quoting *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019)).

"*Batson* sets out a sequential, three-step process for determining whether purposeful discrimination in the selection of the jurors has occurred." *Williams v. Commonwealth*, 82

- 11 -

Va. App. 639, 649 (2024). First, "the opponent of the strike 'must make out a prima fac[i]e case' of purposeful discrimination." *Bethea*, 297 Va. at 748 (quoting *Johnson v. California*, 545 U.S. 162, 168 (2005)). "Once the defendant makes the requisite showing, the burden shifts to the [Commonwealth] to explain adequately the racial exclusion." *Batson*, 476 U.S. at 94. The Commonwealth must then offer "permissible race-neutral justifications for the strikes." *Bethea*, 297 Va. at 748 (quoting *Johnson*, 545 U.S. at 168). If the Commonwealth tenders a race-neutral explanation, the trial court "must then decide whether the opponent of the strike has proved purposeful racial discrimination." *Id.* (quoting *Johnson*, 545 U.S. at 168). The *Batson* framework "presumes the good faith of prosecutors" and the opponent of the strike "bears the 'burden of *persuasion*' to 'prove the existence of purposeful discrimination.'" *Williams*, 82 Va. App. at 649 (quoting *Johnson*, 545 U.S. at 170-71).

Johnson contends that the trial court erred when it denied his *Batson* challenge; specifically, that it failed to properly analyze the third prong of his *Batson* challenge. As the opponent of the strike, Johnson bore the ultimate burden to prove purposeful racial discrimination. In making his *Batson* challenge, Johnson conceded the prosecutor's good-faith and argued that the true issue was the "social racial dynamics of this jury pool." The Commonwealth offered race-neutral reasons for each strike: one juror cared for a baby at home, the other juror had not actively participated during voir dire.

At stage three, the trial court credited the Commonwealth's "nondiscriminatory bases" for its preemptory strikes. On appeal, we afford "great deference" to the trial court's credibility determination. *Davis v. Ayala*, 576 U.S. 257, 271 (2015). Considering the credibility finding and Johnson's own candid admission that the true problem was with the jury pool itself, Johnson failed to carry his burden of persuasion to prove that the prosecutor engaged in purposeful

discrimination.  Accordingly, we find that the trial court properly denied Johnson's *Batson* motion.

II.  The evidence supports the jury's verdict.

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one."  *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).  "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680).  "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'"  *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The question on appeal is not if the Court believes the evidence at trial was sufficient, but only whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Cappe v. Commonwealth*, 79 Va. App. 387, 398 (2024) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).  Johnson challenges the sufficiency of the evidence underlying his convictions for unlawful wounding, abduction, and eluding.  We address each in turn.

A.  Unlawful wounding

"If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony."  Code § 18.2-51.  "If such act be done unlawfully

but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony." *Id.* "The element of malicious wounding that distinguishes it from unlawful wounding is malice, expressed or implied." *Witherow v. Commonwealth*, 65 Va. App. 557, 566 (2015) (quoting *Hernandez v. Commonwealth*, 15 Va. App. 626, 631 (1993)). If one acts without malice, but "still commits a legally unjustified wounding with the intent to maim, disfigure, disable, or kill," he is guilty of the lesser-included offense of unlawful wounding. *Williams v. Commonwealth*, 64 Va. App. 240, 248 (2015).

"Intent is the purpose formed in a person's mind at the time an act is committed." *Welch v. Commonwealth*, 79 Va. App. 760, 768 (2024) (quoting *Johnson v. Commonwealth*, 53 Va. App. 79, 100 (2008)). Intent "may, *and often must*, be inferred from the facts and circumstances" and "may be shown by [the defendant's] acts and conduct." *Perkins v. Commonwealth*, 295 Va. 323, 330 (2018) (quoting *Burton v. Commonwealth*, 281 Va. 622, 626-27 (2011)). Whether Johnson acted with the requisite intent was a factual issue for the jury.

The evidence presented permitted the jury to find that Johnson, who was angry, bit and struck Washington when she confirmed that she did not love him and wanted to get out of the car. When Washington tried to exit the SUV, Johnson grabbed her arm and dragged her alongside the moving vehicle for about 25 feet, causing road abrasions to her feet and knees. Once he stopped, he tackled her and tried to force her back into the SUV, biting her on the hip in the process. He then dropped her on a grassy area beside the road, as eyewitnesses came to help her.

Photographs introduced at trial showed that Washington suffered bruising on her arm, road abrasions on her feet and knees, and bleeding on her forehead and hip where Johnson bit her. The jury could reasonably conclude that the evidence of Johnson's actions—biting Washington on her head and hip, holding her arm and dragging her alongside a moving SUV for about 25 feet—

- 14 -

showed his intent to maim, disable, disfigure, or kill Washington when she tried to escape from his vehicle.

### B. Abduction

"Any person who, by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty . . . shall be deemed guilty of 'abduction.'" Code § 18.2-47(A). "A defendant detains his victim by keeping the victim in a specific place 'through the use of force, intimidation, or deception.'" *Brown v. Commonwealth*, 74 Va. App. 721, 731, (2022) (quoting *Commonwealth v. Herring*, 288 Va. 59, 74 (2014)).

Johnson refused to stop at Washington's house at the end of the evening because he decided that they "weren't done talking." Johnson agreed that he did not stop at Washington's house because her brother was there and he was "trying to get [himself] back together." He detained her in the SUV as he transported her away from her house and into a rural area despite her repeated pleas to stop and either take her home or let her out of the vehicle. Johnson forcibly grabbed Washington's arm when she tried to escape the SUV and dragged her about 25 feet. The eyewitnesses saw him stop the SUV in the middle of the road, tackle Washington as she tried to escape, and then try to force her back into the SUV. From these circumstances, the jury reasonably could conclude that Johnson detained and transported Washington against her will with the intent to deprive her of her personal liberty.

Johnson disputed the Commonwealth's evidence and steadfastly claimed he saved Washington's life by stopping her from jumping from the moving SUV. The jury was "entitled to disbelieve the self-serving testimony of the accused." *Taylor v. Commonwealth*, 77 Va. App. 149, 172 (2023) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509 (1998)). Indeed, "[a]s the trier of fact, the jury was entitled to disbelieve" Johnson's "uncorroborated and confused testimony"

and to "discount" his "credibility on account of his prior felony conviction." *Wright v. West*, 505 U.S. 277, 296 (1992); *see* Code § 19.2-269; *Sadoski v. Commonwealth*, 219 Va. 1069 (1979). The jury may consider Johnson's demeanor when he testified, which we may not review. And if the jury did disbelieve Johnson, "it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt." *Wright*, 505 U.S. at 296.

In sum, the evidence permitted the jury to conclude that Johnson, without any legal justification or excuse, used force to transport and detain Washington with the intent to deprive her of her personal liberty.

C. Eluding

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person is guilty of a Class 6 felony.

Code § 46.2-817(B). Johnson concedes that he failed to preserve his challenge to the eluding conviction for appeal. Still, he asks this Court to apply the ends of justice exception to Rule 5A:18 and consider the merits of his sufficiency argument.

"The 'ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Cornell v. Commonwealth*, 76 Va. App. 17, 31 (2022) (quoting *Conley v. Commonwealth*, 74 Va. App. 658, 682 (2022)). To avail oneself of the exception, "[the appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 210 (2016) (en banc) (alteration in original) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 221 (1997)). It is not enough for an appellant "to merely assert a winning argument on the merits—for if that were enough[,] procedural default 'would never apply, except when it does not

- 16 -

matter.'" *Winslow v. Commonwealth*, 62 Va. App. 539, 546 (2013) (quoting *Alford v. Commonwealth*, 56 Va. App. 706, 710 (2010)).

The exception applies when there has been a "'grave injustice' or a wholly inexcusable 'denial of essential rights.'" *Id.* at 546-47 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 513 (2009)). The error must be "clear, substantial and material." *Brown v. Commonwealth*, 279 Va. 210, 219 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 338 (2004)). And an appellant bears a "heavy" burden to demonstrate that a miscarriage of justice has occurred. *Holt*, 66 Va. App. at 210 (quoting *Brittle*, 54 Va. App. at 514). Generally, meeting that burden requires an appellant to "point . . . to a particular place in the record" that "affirmatively establishes that an element of the offense did not occur." *Brittle*, 54 Va. App. at 517-18.

Johnson has failed to establish that a manifest injustice has occurred. At trial, Deputy Pearce's testimony, supported by his body worn and dashcam videos, established that Johnson returned to his car and drove away when Pearce arrived at the scene. While admittedly not a high-speed pursuit, Johnson disregarded Pearce's blue emergency lights and audible signals—the siren chirps—and continued to drive despite Pearce's signals to stop. The record does not establish that Johnson was convicted for conduct that is not criminal nor does it prove that an element of the offense did not occur. *Cisneros v. Commonwealth*, 82 Va. App. 147, 171 (2024) (quoting *Holt*, 66 Va. App. at 210). We find that the ends of justice exception does not apply, so Johnson's challenge to his eluding conviction is waived. Rule 5A:18.

III. The trial court appropriately denied Johnson's request for a continuance.

"The decision to grant a motion for a continuance is within the sound discretion of the circuit court and must be considered in view of the circumstances unique to each case." *Moroney v. Majerus*, 82 Va. App. 737, 757 (2024) (quoting *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007)). "[T]he abuse of discretion standard requires a reviewing

court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Bista v. Commonwealth*, 303 Va. 354, 370 (2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

Courts are "accorded wide discretion in deciding whether to grant continuances to enable a defendant to secure new counsel." *McNair v. Commonwealth*, 37 Va. App. 687, 697 (2002). The record shows that the trial court exercised its discretion appropriately throughout the three years the case was pending in the trial court. After Johnson discharged his retained counsel, the trial court appointed several attorneys and granted him multiple continuances to afford new counsel time to prepare for trial. Each attorney who represented Johnson moved to withdraw; each cited the same issues with Johnson's refusal to cooperate and his continual *pro se* filings to the court despite being represented. Even after the trial court admonished him to stop filing motions and work with his attorney, Johnson persisted.

"When a criminal defendant argues on appeal that the trial court erred by denying his continuance motion . . . , we apply a 'two-pronged test' asking whether 'the court abused its discretion' and whether the defendant 'was prejudiced by the court's decision.'" *Bolden v. Commonwealth*, 49 Va. App. 285, 290 (2007) (quoting *Lebedun v. Commonwealth*, 27 Va. App. 697, 712-13 (1998)). The defendant must prove both prongs, as "[t]he absence of one renders inconsequential the presence of the other." *Id.* (citing *Lowery v. Commonwealth*, 9 Va. App. 304, 307 (1990)).

To begin, we find that the trial court did not abuse its discretion in denying Johnson's request for a continuance on the day of the sentencing hearing. Johnson had discharged his

court-appointed trial counsel in June following the March trial. At a status hearing on July 5, 2022, the trial court advised Johnson that he could hire a lawyer for sentencing, but noted that there was a "pattern that has existed throughout this case" between Johnson and his attorneys. The trial court found that Johnson had "significant problems with the relationships" with his attorneys and counted five retained or court-appointed counsel who had moved to withdraw because of his "lack of cooperation and deteriorating relationship[s]." Despite Johnson's claim that he "ain't gave [his attorneys] no problem, no argument, nothing like that," the record supports the trial court's finding that Johnson "placed his counsel in a position that precluded effective representation and thereby constructively discharged" him. *Walker v. Commonwealth*, 71 Va. App. 665, 677 (2020) (quoting *McNair*, 37 Va. App. at 697). The trial court granted Johnson's motion for a continuance to hire an attorney but expressly warned him that there would be a sentencing hearing on August 15, 2022.[13] Johnson did not hire counsel. Thus, we find no error in the denial of the continuance.

CONCLUSION

Accordingly, we affirm the trial court's judgment.

*Affirmed.*

---

[13] The August 15, 2022 date was the fourth sentencing date that had been scheduled.